IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

EARNEST CAMPBELL                )
CHINAULT, JR.,                  )
    Plaintiff,              )
                                )
v.                              )     Civil No. 3:14cv416 (DJN)
                                )
CAROLYN W. COLVIN               )
Acting Commissioner of Social Security, )
    Defendant.              )
_____ )

## MEMORANDUM OPINION

Earnest Chinault, Jr. ("Plaintiff") is thirty-six years old and previously worked as a construction laborer and foreman. On August 23, 2010, Plaintiff protectively filed for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), claiming disability from bipolar disorder, hepatitis C, back surgery and asthma with an alleged onset date of August 15, 2009. Plaintiff's claim was denied both initially and on reconsideration. On October 10, 2012, Plaintiff (represented by counsel) appeared at a hearing before an Administrative Law Judge ("ALJ"). The ALJ denied Plaintiff's claim in a written decision issued on November 8, 2012. On April 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner").

Plaintiff now appeals the Commissioner's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing the state agency psychologist's opinion regarding Plaintiff's mental health and, as a result, in determining Plaintiff's Residual Functional

Capacity ("RFC") and posing hypotheticals to the Vocational Expert ("VE") reflecting Plaintiff's limitations. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 22-29.) Defendant responds that the ALJ did not err and that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Br.") (ECF No. 16) at 9-11.) This matter comes before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on the parties' cross-motions for summary judgment, which are now ripe for review.

Having reviewed the parties' submissions and the entire record in this case,[1] for the reasons that follow, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 12), GRANTS Defendant's Motion for Summary Judgment (ECF No. 16) and AFFIRMS the final decision of the Commissioner.

## I.    BACKGROUND

Given the challenges to the ALJ's decision, Plaintiff's education and work history, medical records, state agency physicians' opinions, function reports and hearing testimony are summarized below.

### A.  Education and Work History

Plaintiff has a ninth grade education and previously worked as a construction laborer and foreman. (R. at 217-18.)

### B.  Medical Records

Plaintiff first visited Virginia Commonwealth University ("VCU") Primary Care for psychological therapy on February 23, 2010. (R. at 698.) Plaintiff did not return for a follow-up

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

appointment until February 15, 2011, at which point he returned regularly for follow-up visits until May 31, 2011. (R. at 682-98.)

Plaintiff arrived on time for his initial visit on February 23, 2010, complaining of emotional outbursts — crying, yelling or urges to break things — two to three times per day. (R. at 698.) Plaintiff shared that, until eight months before this appointment, he had been able to control these outbursts by walking away or taking several deep breaths. (R. at 698.) Plaintiff also struggled to present his personal history and had difficulty remembering when certain life events happened — including when he stopped abusing substances and when his mother and best friend died. (R. at 698.) Plaintiff also reported having significant trouble sleeping, and stated that he typically stayed up until 5:00 a.m. or 6:00 a.m. and woke up two hours later for work. (R. at 698.)

On February 15, 2011, Plaintiff returned for a follow-up visit, complaining of severe depression, inability to get out of bed, crying outbursts and that he seldom left the house. (R. at 696.) He appeared extremely hopeless. (R. at 696.) Plaintiff indicated that leaving the house for the session was a positive experience and that he enjoyed the drive. (R. at 696.) Plaintiff had difficulty identifying other pleasant activities that motivated him to leave the house. (R. at 696.) A major source of Plaintiff's depression was not being able to see his children, so his motivation to get out of his house and be more positive in his outlook was the possibility of his ex-wife allowing him to visit their children. (R. at 696.)

On February 22, 2011, Plaintiff met with Aaron Martin, a graduate student in psychology, and arrived thirty minutes late for his appointment, stating that he thought it was scheduled for a different time. (R. at 694.) Plaintiff was not able to go on a planned beach trip, but had briefly visited his sister since his last appointment. (R. at 694.) Plaintiff also watched a

3

car race with a friend, but he "felt awful the whole time" and was irritated that he had to "pretend to be okay." (R. at 694.) Plaintiff thought of activities that might help to distract him from negative feelings and made a list, including: finishing a cradle for his daughter's dolls, completing a grandfather clock, rebuilding part of a car engine, and cleaning and organizing his garage. (R. at 694.)

On March 1, 2011, Plaintiff met with Mr. Martin and stated that of the activities that he listed during his previous session, he was only able to do some cleaning in his garage. (R. at 692.) Still, Plaintiff was able to get out of the house "most days" during the prior week. (R. at 692.) Plaintiff attended court, helped his father fix a truck and visited with family. (R. at 692.) While visiting with family, Plaintiff fought with his sister and brother-in-law, so they went home early. (R. at 692.) Plaintiff expressed concern that his anger and irritability would lead to physical altercations that could get him into legal trouble. (R. at 692.)

On March 22, 2011, Plaintiff met with Mr. Martin and discussed the legal requirements that he must satisfy before he could see his children, specifically, a parenting course. (R. at 690.) Plaintiff said that he had not completed the course, because he could not afford the classes, but acknowledged that he also "might be procrastinating." (R. at 690.) Plaintiff noted that he had memory problems several times during his appointment and mentioned insomnia. (R. at 690.) Plaintiff also discussed the list of activities that he created during his previous appointment that he wanted to complete. (R. at 690.)

On April 5, 2011, Mr. Martin described Plaintiff as mildly tearful with depressed affect. (R. at 688.) Plaintiff expressed a lack of desire to live, but said that he was motivated to "tough[] it out" with his depression to see his children again. (R. at 688.) Mr. Martin noted that Plaintiff's participation in psychological counseling and concern for his medical condition

4

indicated his will to live. (R. at 688.) Plaintiff also said that lately he had been "snappy" with his father and girlfriend. (R. at 688.) Plaintiff received a "Pleasant Activities Schedule" to be reviewed during his next visit. (R. at 688.)

On April 12, 2011, Plaintiff saw Alison Eonta, a graduate student in psychology. (R. at 686.) Plaintiff was assessed as severely depressed and severely anxious based on his responses to the PHQ-9 and GAD-7 questionnaires, which measure depression and anxiety, respectively. (R. at 686.) Ms. Eonta observed that Plaintiff did not appear as severely depressed or anxious as his PHQ-9 and GAD-7 scores would suggest. (R. at 686.) Rather, Plaintiff seemed "somewhat more upbeat than previous weeks," smiling at the medical staff and trying to engage in pleasant conversation. (R. at 686.) Plaintiff's results on the Cognistat (a brief neurobehavioral cognitive status evaluation) indicated possible memory impairment, but other functions — including attention, orientation, calculations, and comprehension — were within normal limits. (R. at 686.) Plaintiff expressed concern that he may be suffering from Alzheimer's, but Ms. Eonta remarked that it was unlikely based on Plaintiff's relatively young age and his lack of other deficits. (R. at 686.) Ms. Eonta gave Plaintiff another Pleasant Activities Schedule, because he said that he had lost the one that he had received during his previous appointment. (R. at 686.)

On April 26, 2011, Plaintiff met with Mr. Martin, who noted that Plaintiff seemed slightly less anxious and depressed than his diagnosis of severe anxiety and severe depression would suggest. (R. at 684.) Plaintiff stated that he had completely forgotten the Pleasant Activities Schedule, and Mr. Martin noted that he appeared to have genuinely forgotten. (R. at 684.) Mr. Martin discussed the results of Plaintiff's cognitive screening with him and performed additional Cognistat testing of Plaintiff's short-term memory. (R. at 684.) The results were consistent with Plaintiff's previous performance and indicated some deficits in short-term

5

memory. (R. at 684.) Plaintiff noted that using a calendar at home had been helpful with remembering and keeping appointments. (R. at 684.) Plaintiff explained that when he socialized, he preferred to limit his social visits to short periods of time, but felt "talked into" doing things he did not want to do. (R. at 684.) Nevertheless, Plaintiff stated that he did enjoy eating dinner with friends, and Mr. Martin encouraged him to repeat that experience before his next appointment. (R. at 684-85.)

On May 31, 2011, Ms. Eonta noted that Plaintiff presented as slightly less anxious and depressed than his assessments indicated. (R. at 682.) Plaintiff reported greater difficulty controlling his moods than usual and indicated that he was more likely to stay in bed than go to social events. (R. at 682.) Still, Plaintiff said that he wanted to be more active and socially engaged, so that he did not disappoint others. (R. at 682.) He was concerned about having verbal "outbursts" towards his girlfriend in his sleep. (R. at 682.) Ms. Eonta noted that Plaintiff's hepatitis C medication could be aggravating his depressive symptoms and encouraged Plaintiff to follow-up with his psychiatric referral, keep a sleep diary and fill out an activity log tracking his outbursts. (R. at 682-83.)

On January 23, 2012, Plaintiff followed-up with Salim Zulfiqar, M.D. of the VCU Department of Psychiatry, complaining of nausea and vomiting. (R. at 709.) Plaintiff reported some improvement in his mood and sleep, but increased panic attacks. (R. at 709.) He also reported smoking twenty less cigarettes per day since starting Wellbutrin. (R. at 709.) Plaintiff was alert, well groomed and cooperative. (R. at 710.) His speech was relevant and coherent. (R. at 710.) He was oriented to all spheres and his thought processes were spontaneous, linear, logical and goal directed, with no abnormal thought content. (R. at 710.) He exhibited fair reliability, concentration and eye contact, but poor judgment and insight. (R. at 710-11.) His

6

affect was excited, but his mood was depressed. (R. at 710.) Dr. Zulfiqar assessed Plaintiff with

a Global Assessment of Functioning ("GAF") score of 55[2] and diagnosed anxiety and moderate

depression. (R. at 711.) Dr. Zulfiqar increased Plaintiff's Wellbutrin dosage, prescribed Xanax

for his twice weekly panic attacks, continued Plaintiff's Trazadone prescription and instructed

him to continue taking Benadryl to alleviate his insomnia. (R. at 711.) He informed Plaintiff

about the side effects of these medications, including headaches, nausea, diarrhea and sedation.

(R. at 711.) Dr. Zulfiqar discontinued Effexor due to Plaintiff's nausea and vomiting, and

Plaintiff agreed to hand over his guns to manage his risk of suicide. (R. at 711.)

On February 27, 2012, Plaintiff returned to see Dr. Zulfiqar, complaining of daily anxiety

attacks. (R. at 713.) Plaintiff reported some mood and sleep improvement, but increased anxiety

and panic attacks in the week preceding his appointment. (R. at 713.) Dr. Zulfiqar noted that

Plaintiff appeared alert, well groomed and cooperative. (R. at 714.) His assessment of

Plaintiff's speech, affect, mood, thought processes and content, orientation, concentration, eye

contact, reliability, judgment and insight remained unchanged from Plaintiff's previous

appointment. (R. at 714-15.) Dr. Zulfiqar once again assessed anxiety and moderate depression.

(R. at 715.) He increased Plaintiff's Paxil dosage and continued his other medications. (R. at

715.)

---

[2]        The GAF is a numerical scale (0 through 100) used by mental health clinicians and
physicians to rate the social, occupational and psychological functioning of adults. Scores
ranging from 51-60 indicate moderate symptoms or moderate difficulty in social, occupational or
school functioning. Notably, the latest version of the Diagnostic and Statistical Manual of
Mental Health Disorders ("DSM") has dropped the use of GAF scores, finding that their use has
been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine
practice." DSM-5 16 (American Psychiatric Association 2013).

D. State Agency Psychologist

On August 15, 2011, Dr. Bryce Phillips, Psy. D., a state agency psychologist, assessed Plaintiff's mental impairments and mental RFC based on his evaluation of Plaintiff's mental health treatment records. (R. at 97, 100-01.) Dr. Phillips considered whether Plaintiff satisfied the requirements under listings 12.04-Affective Disorders and 12.06-Anxiety-Related Disorders and determined that although Plaintiff had a medically determinable impairment, the medical evidence did not establish the "A" criteria of the listings. (R. at 97.) Next, Dr. Phillips determined that Plaintiff had mild restriction in his activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (R. at 97.) Therefore, Dr. Phillips concluded that the "B" criteria of the listings were unsatisfied. (R. at 97.) Finally, Dr. Phillips determined that the "C" criteria of the listings were not satisfied. (R. at 97.) Thus, Plaintiff did not meet or medically equal listings 12.04 or 12.06. (R. at 97.)

Dr. Phillips assessed Plaintiff's mental RFC and opined that Plaintiff had "noted but not severe" memory problems. (R. at 100.) Specifically, Dr. Phillips concluded that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or understand and remember short and simple instructions, but was moderately limited in his ability to understand and remember detailed instructions. (R. at 100.) He was not significantly limited in his ability to carry out very short and simple instructions, but was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods and sustain an ordinary routine without special supervision. (R. at 100.) Plaintiff needed encouragement to perform tasks. (R. at 101.) Plaintiff was also moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances. (R. at 100.) Plaintiff was not significantly limited in his ability to work in coordination with or in proximity to others without distraction, make simple work-related decisions or complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 100-01.) Additionally, while Plaintiff claimed severe limitations with activities of daily living, most recent psychological reports showed normal mental status. (R. at 101.)

Dr. Phillips concluded that Plaintiff's ability to interact socially was somewhat limited. (R. at 101.) He remarked that Plaintiff did not visit with others, but his mental status assessments from treating sources did not show significant symptoms of severely limited social abilities. (R. at 101.) Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors. (R. at 101.) Dr. Phillips noted that "[s]upervisory feedback should be supportive, encouraging, and utilize positive reinforcement." (R. at 101.) Plaintiff was not significantly limited in his ability to ask simple questions and request assistance, get along with co-workers without distracting them or exhibiting extreme behaviors or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 101.) Plaintiff had no adaptation limitations. (R. at 101.)

Ultimately, Dr. Phillips concluded that Plaintiff retained the RFC to perform competitive work on a consistent basis despite limitations resulting from his mental impairments. (R. at 101.)

E. Function Reports

On September 20, 2010, Plaintiff's friend Vicki Fields completed a function report. (R. at 224-35.) She noted that Plaintiff needed reminders to keep up with personal care, take his

9

medicine and complete household tasks. (R. at 227.) Plaintiff socialized with others only over the phone. (R. at 230.) Plaintiff's conditions affect his ability to understand, complete tasks and get along with others. (R. at 230.) Plaintiff had been fired or laid off for arguing or fighting at work. (R. at 231.) Plaintiff did not handle stress or changes in routine well. (R. at 232.)

On September 22, 2010, Plaintiff completed a function report. (R. at 248-55.) Plaintiff indicated that he lived in a house with friends and spent his days reading, watching television, eating, listening to music and looking for things that he could do. (R. at 248.) Plaintiff could sometimes feed his dog, but had help caring for the dog's other needs. (R. at 249.) He could shave, feed himself, do his hair and use the toilet without assistance, but sometimes needed help dressing and bathing. (R. at 249.) Plaintiff did not need reminders to take care of his personal needs and grooming, but did need reminders to take his medication. (R. at 250.) Plaintiff did not prepare his own meals, and did not perform household chores or yard work due to pain. (R. at 250.) He went outside once or twice per week, and when he went out would ride in a car. (R. at 251.) He could go out alone, but did not drive. (R. at 251.) Plaintiff was not able to pay bills or use a checkbook, but could count change and handle a savings account. (R. at 251.)

Plaintiff indicated that his interests included playing the guitar and watching movies, but stated that he was unable to play his guitar on a daily basis because of his condition. (R. at 252.) Plaintiff socialized on the phone once a week. (R. at 252.) Plaintiff attended doctor's appointments on a regular basis, but needed reminders to do so and needed someone to accompany him. (R. at 252.) Plaintiff's conditions affected his abilities in several areas, including memory, completing tasks and concentration. (R. at 253.) He could pay attention for approximately ten minutes. (R. at 253.) He did not finish what he started, even with written instructions, but he could usually follow spoken instructions unless he forgot them. (R. at 253.)

He sometimes had problems getting along with others. (R. at 253.) He could typically get along with authority figures, unless he felt anxious. (R. at 254.) Plaintiff had gotten in verbal arguments with others at work, but had not been fired as a result. (R. at 254.) He did not handle stress well, because it gave him anxiety. (R. at 254.) Changes in routine did not bother Plaintiff. (R. at 254.) Plaintiff also stated that he is bipolar. (R. at 255.)

Plaintiff completed another function report on September 14, 2011. (R. at 270-78.) Plaintiff reported no problems with any of his personal care activities, but still needed reminders to take his medication and go to the doctors. (R. at 271, 274.) Plaintiff reported that because of his depression, he no longer went out alone and only left the house to go to the doctors. (R. at 273.) When he went to his appointments, he needed someone to accompany him. (R. at 274.) Plaintiff indicated that although he enjoyed reading, he rarely did so, because he could not remember everything that he would read. (R. at 274.) Plaintiff also stated that he hated everyone, himself included, and that he did not get along with anyone. (R. at 275.) He could not pay attention for any period of time and had trouble following written and spoken instructions. (R. at 275.) Plaintiff reported having been fired from a job due to his inability to get along with others and having "gone off several times on construction jobs sites" at his boss or other employees. (R. at 276.) Plaintiff could not recall the name of a particular employer with whom such an event had occurred. (R. at 276.) Plaintiff stated that he could not handle stress without losing his temper and did not do well with changes in routine. (R. at 276.) Plaintiff noticed that he was behaving unusually and was seeing a psychologist for help with his bipolar disorder and behavior problems. (R. at 276.)

On November 2, 2011, Plaintiff completed a daily activities questionnaire. (R. 286-90.) Plaintiff reported that his short attention span affected his ability to watch television, listen to the

radio or read. (R. at 287.) Plaintiff visited with family a couple of times a year for approximately an hour or so each visit. (R. at 288.) He visited with friends as well. (R. at 288.) He did not attend any other social activities. (R. at 289.) Plaintiff slept between four and eight hours per night in two-hour stretches. (R. at 289.) He napped during the day, because his illness made him tired and he had no energy. (R. at 289.) Plaintiff indicated that he was once fired from a job, because he was unable to get along with his boss. (R. at 290.)

F. Plaintiff's Testimony

On October 10, 2012, Plaintiff (represented by counsel) testified at a hearing before the ALJ. (R. at 37-67.) Plaintiff stated that he lived with his fiancée, Vicki Fields. (R. at 41.) Plaintiff had a ninth-grade education and a fair ability to read, but could not read large words or spell. (R. at 54.) Plaintiff had not worked since 2008.[3] (R. at 48.) He had been seeing a psychiatrist for anxiety and depression, and his most recent appointment with a psychiatrist or psychologist was six months before the hearing. (R. at 52, 61.) Plaintiff had missed multiple psychologist or psychiatrist appointments — he thought because his insurance had lapsed[4] — but had not missed appointments with other doctors. (R. at 62-63.)

Plaintiff suffered from emotional breakdowns, during which he would cry uncontrollably. (R. at 53.) At times, Plaintiff had problems with anger and controlling his emotions. (R. at 54.)

---

[3]     Plaintiff's testimony is somewhat inconsistent with other evidence of record as to whether Plaintiff stopped working in 2008. (R. at 41 (stating that Plaintiff stopped working in 2009); R. at 217 (stating that Plaintiff stopped working on April 30, 2008, because his wages were lowered, but believes that his conditions became severe enough to stop him from working in August 2009); R. at 698 (stating that in 2010, Plaintiff has trouble sleeping and would only fall asleep at 5 or 6 in the morning "only to wake up for work 2 hours later").)

[4]     Plaintiff testified that Ms. Fields handled his finances and scheduled his appointments, therefore, she would know why he missed his mental health appointments. (R. at 63.) Ms. Fields submitted testimony in writing stating that Plaintiff's financial aid had expired, thus he could not see his psychiatrist; however, Plaintiff's primary care physicians had been accommodating. (R. at 377-78.)

He had difficulty interacting with people and typically stayed at home. (R. at 53, 58.) He did not go out and did not invite people to his home, but he socialized with his fiancée and ate meals with her. (R. at 53-54.) Plaintiff thought he would probably not be able to work with people for eight hours each day. (R. at 54.)

Plaintiff required assistance and reminders to take his medications for his back pain, asthma and hepatitis. (R. at 55.) He had difficulty remembering whether he had taken his medication, and would forget the plots of movies while he was watching them. (R. at 56-57.) His medication affected his ability to concentrate, and he was unable to watch a two-hour movie or read a book. (R. at 56.) He would occasionally stay in bed for extended periods of time, but could not remember a recent instance. (R. at 59.) Plaintiff believed his depression and back pain kept him from working. (R. at 60.)

G. Vocational Expert Testimony

A VE also testified before the ALJ during the hearing on October 10, 2012. (R. at 61.) The ALJ posed two hypotheticals to the VE. (R. at 64-65.) The first concerned whether a person of Plaintiff's age, education and work experience limited to performing light work with the ability to understand, recall and carry out short, simple instructions, and perform simple routine work with occasional interaction with others could perform work in the national economy. (R. at 64.) The VE testified that such a person could work as an assembler (approximately 220,000 jobs nationally, 4,000 in Virginia), a laundry folder (approximately 80,000 jobs nationally, 1,200 in Virginia) or a marker II (approximately 149,000 jobs nationally, 3,600 in Virginia). (R. at 64.) The second concerned the same hypothetical individual with the additional limitation that the person would be consistently off task for twenty percent or more of

each eight-hour work day due to pain, psychological factors and side effects of medication. (R. at 65.) The VE testified that such a person would not be employable. (R. at 65.)

## II.     PROCEDURAL HISTORY

On August 23, 2010, Plaintiff filed for DIB and SSI, claiming disability from bipolar disorder, hepatitis C, back surgery and asthma with an alleged onset date of August 15, 2009. (R. at 189-201.) Plaintiff's claims were denied initially and on reconsideration. (R. at 122-27, 131-43.) On October 10, 2012, Plaintiff (represented by counsel) testified before the ALJ during a hearing. (R. at 39-63.) On November 8, 2012, the ALJ issued a written decision denying Plaintiff's claims. (R. at 24-36.) On April 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

## III.     QUESTIONS PRESENTED

1. Did the ALJ err in his assessment of the state agency psychologist's opinion?

2. Did the ALJ err by posing hypotheticals to the VE that failed to include all of Plaintiff's mental limitations?

## IV.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

14

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 476 (citation omitted). If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be

substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a), 416.972(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b); 416.972(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. §§ 404.1572(c), 416.972(c). If a claimant's work constitutes SGA, the analysis ends, and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. *Id.*

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) that lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[5] based on an assessment of the claimant's RFC[6] and the "physical and mental demands of work [the claimant] has done in

---

[5]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[6]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5). The Commissioner can carry that burden in the final step with the testimony of a VE. 20 C.F.R. §§ 404.1520(f), 416.920(f). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

---

SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

V.  ANALYSIS

A.  The ALJ's Decision

On October 10, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 39-67.)  On November 8, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 24-36.)  The ALJ followed the required five-step sequential analysis in reaching that decision. (R. at 25-36.)

At step one, the ALJ found that Plaintiff had not engaged in SGA since his alleged onset date of August 15, 2009. (R. at 26.)  At step two, the ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar spine, hepatitis C, internal hemorrhoids, major depressive disorder and anxiety disorder. (R. at 26.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments meeting or medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27.)  The ALJ found that Plaintiff maintained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1527(b) and 416.967(b) with certain restrictions. (R. at 29.)  Plaintiff was limited to frequently balancing, and occasionally stooping, kneeling, crouching, crawling, and climbing stairs, ramps, ropes, ladders, and scaffolds. (R. at 29.)  Plaintiff was also to avoid concentrated exposure to hazardous machinery and height due to side effects of his medication. (R. at 29.)  Further, due to psychological limitations, Plaintiff was limited to performing simple, routine work and had the ability to understand, recall, and carry out short, simple instructions and occasionally interact with the general public and co-workers. (R. at 29.)

At step four, the ALJ determined that Plaintiff could not perform his past relevant work as a construction worker. (R. at 34.)  At the fifth and final step, the ALJ considered the claimant's age, education, work experience and RFC, and determined that Plaintiff was capable

18

of performing other work that is available in significant numbers in the national economy. (R. at 35.) Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (R. at 36.)

Plaintiff challenges the ALJ's decision on two grounds. First, Plaintiff argues that the ALJ erred by disregarding the opinion of Dr. Phillips and evidence from treating physicians. (Pl.'s Mem. at 22-27.) Second, Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's impairments in the hypothetical questions posed to the VE. (Pl.'s Mem.at 27-29.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Br. at 9-11.)

B. The ALJ did not err in assigning some weight to Dr. Phillips's opinion.

Plaintiff contends that the ALJ erred in evaluating the medical evidence by dismissing Dr. Phillips's medical opinion. (Pl.'s Mem. at 23-24.) Defendant responds that the ALJ did not dismiss Dr. Phillips's opinion, and that substantial evidence supports the ALJ's decision to afford some weight to Dr. Phillips's opinion. (Def.'s Br. at 9-11.)

During the sequential analysis, the ALJ must analyze the claimant's available medical records and any medical evidence resulting from consultative examinations or medical expert evaluations to determine whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental abilities to do basic work activities. 20 C.F.R. §§ 404.1512(a)-(e), 416.912(a)-(e); 20 C.F.R. §§ 404.1527, 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent with each other or other evidence in the record, then the ALJ must evaluate the opinions and assign

19

them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

State agency psychological consultants are highly qualified psychologists who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Therefore, when considering the opinion of a state agency psychological consultant, the ALJ must evaluate those findings just as she would for any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Except when a treating source's opinion is afforded controlling weight, the ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency . . . psychological consultant . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

In this case, the ALJ discussed Plaintiff's psychological and psychiatric treatment records, but did not give controlling weight to a treating source's opinion regarding Plaintiff's mental RFC. (R. at 30, 32-34.) The ALJ stated that she afforded some weight to Dr. Phillips's opinion to the extent that it was supported by the medical evidence of record, and largely incorporated Dr. Phillip's assessment into Plaintiff's RFC determination. (R. at 34.) Dr. Phillips opined that Plaintiff had "noted but not severe" memory problems, meaning Plaintiff was "able to recall short and simple instructions, but would have difficulty with recalling and understanding complex or detailed instructions." (R. at 100.) Dr. Phillips also opined that Plaintiff was not significantly limited in his ability to work in coordination with or in proximity to others without distraction. (R. at 100-01.) Ultimately, Dr. Phillips concluded that Plaintiff was able to perform competitive work on a consistent basis, despite his mental limitations. (R. at 101.) With respect to Plaintiff's mental and emotional limitations, the ALJ determined that

"[Plaintiff] is limited to performing simple, routine work. He can understand, recall, and carry out short, simple instructions, and have occasional interaction with the general public and coworkers." (R. at 29.) This RFC is consistent with Dr. Phillips's assessment of Plaintiff's mental limitations and supported by substantial evidence. (R. at 100-01.)

Plaintiff's mental health treatment records support the ALJ's determination. Plaintiff's treatment during the relevant period was conservative, consisting of outpatient psychological therapy and psychiatric appointments and medication. (R. at 682-98, 709-715.) Plaintiff first sought psychological care on February 23, 2010, but did not return for a follow-up appointment until nearly a full year later. (R. at 698, 696-97.) Plaintiff's treatment providers repeatedly noted that Plaintiff appeared less severely depressed and anxious than his self-reported symptoms suggested. (R. at 682, 684, 686.) On evaluation, Plaintiff demonstrated normal mental functioning in multiple areas, including attention, orientation, calculations, and comprehension. (R. at 101, 686.) Plaintiff consistently exhibited normal thought processes that were spontaneous, linear, logical and goal directed, with no abnormal thought content and orientation to all spheres. (R. at 710, 714-15.) He exhibited fair reliability, concentration and eye contact. (R. at 710-11, 714-15.) Dr. Zulfiqar, Plaintiff's treating psychiatrist, assessed Plaintiff with a GAF score of 55, indicating only moderate symptoms or difficulty in social or occupational functioning. (R. at 711.)

Plaintiff's own statements further support the ALJ's decision to afford some weight to Dr. Phillips's opinion. Although Plaintiff suffered from difficulty with his memory, he reported that using a calendar helped him remember and keep appointments. (R. at 684.) He needed reminders to take his medication and attend doctor's appointments, but did not need reminders to care for his personal needs and grooming. (R. at 250, 252, 271, 274.) During the course of his

treatment, Plaintiff reported playing the guitar and watching movies, socializing on the phone once per week, visiting family several times per year and visiting with friends for one to two hours at a time.  (R. at 248, 252, 274, 288.)  Thus, substantial evidence supports the ALJ's decision to afford some weight to Dr. Phillips's opinion regarding Plaintiff's mental limitations.

      C.  The ALJ accounted for Plaintiff's mental limitations in her hypotheticals to the VE.

Plaintiff argues that Defendant failed to carry her burden at step five of the sequential analysis by failing to include all of Dr. Phillips's assessed limitations in her hypothetical questions to the VE.  (Pl.'s Mem. at 27-29.)  Defendant counters that the ALJ's hypothetical accurately encompassed Plaintiff's RFC, which incorporated those limitations identified by Dr. Phillips that were supported by Plaintiff's medical evidence.  (Def.'s Br. at 11.)  Therefore, Defendant asserts, the VE's testimony constituted substantial evidence sufficient to satisfy Defendant's burden at step five.  (Def.'s Br. at 11.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner can carry her burden at the final step with the testimony of a VE.  *Walker*, 889 F.2d at 50.  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all of the record evidence and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Id.*  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

During the hearing on October 10, 2012, the ALJ posed two hypotheticals to the VE.  (R.

at 64-65.) The first concerned whether a person of Plaintiff's age limited to performing light work with the ability to understand, recall, and carry out short simple instructions and perform simple routine work with occasional interaction with others could perform work in the national economy. (R. at 64.) The VE testified that such a person could work as an assembler (approximately 220,000 jobs nationally, 4,000 in Virginia), a laundry folder (approximately 80,000 jobs nationally, 1,200 in Virginia) or a marker II (approximately 149,000 jobs nationally, 3,600 in Virginia). (R. at 64.) The second concerned the same hypothetical individual with the additional limitation that the person would be consistently off task for twenty percent or more of each eight-hour work day due to pain, psychological factors and side effects of medication. (R. at 65.) The VE testified that such a person would not be employable. (R. at 65.) Based upon the testimony of the VE, the ALJ determined at step five that Plaintiff was not disabled under the Act. (R. at 36.)

Plaintiff argues that these hypotheticals did not present all of Plaintiff's limitations as assessed by Dr. Phillips. (Pl.'s Mem. at 27-29.) But, the ALJ incorporated the limitations assessed by Dr. Phillips only to the extent that they were supported by the evidence of record. (R. at 34.) The ALJ's first hypothetical accounted for Plaintiff's RFC, which limited Plaintiff to performing simple, routine work with an ability to understand, recall, and carry out short, simple instructions and occasionally interact with the general public and coworkers. (R. at 29.) As explained above, substantial evidence supports the ALJ's RFC determination. Because the hypothetical posed to the VE included all of Plaintiff's limitations described in the RFC, the ALJ did not err.[7]

---

[7]      After the parties filed their motions for summary judgment, the Fourth Circuit issued an opinion in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). As a result, this Court entered an order on April 14, 2015 (ECF No. 18), directing the parties to brief whether *Mascio* impacts the

## V.    CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary

Judgment (ECF No. 12.), GRANTS Defendant's Motion for Summary Judgment (ECF No. 16.)

and AFFIRMS the final decision of the Commissioner.

An appropriate order shall issue.

It is so ORDERED.

_____  /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: May 13, 2015

---

issues in this case.  Defendant filed a memorandum in response to the Court's Order (ECF No.
19); however, Plaintiff elected not to file a response within the time frame provided by the
Court's Order.  Having reviewed Defendant's Memorandum, the Court agrees with Defendant
that *Mascio* does not impact the analysis here.